**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF NEW JERSEY**

_____

BARRY MURPHY,                                      : **CIVIL ACTION**
                                                   :
PLAINTIFF,                                         :
                                                   :
        vs.                            :
                                                   : **NO.  15-2911**
                                                   :
SIEMENS DEMAG DELAVAL                              :
TURBOMACHINERY, INC.,                             : **COMPLAINT**
                                                   :
                                                   : **(JURY TRIAL DEMANDED)**
                                                   :
DEFENDANT.                                         :
_____

      Plaintiff Barry Murphy, by and through his attorneys, Bross & Frankel, P.A.,

hereby files his Civil Action Complaint and Demand for Jury Trial for hostile work

environment, discrimination, and retaliation pursuant to Title VII of the Civil Rights Act

of 1964, 42 U.S.C. §2000(e) et seq.

<u>PRELIMINARY STATEMENT</u>

      Defendant Siemens Demag Delaval Turbomachinery, Inc. has for years violated

Plaintiff's civil rights under Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. §2000(e) et seq.  Defendant unlawfully discriminated against Mr. Barry Murphy

on the basis of his race, and created a work environment so aggressively hostile toward its

African-American workers that supervisors retaliated without fear of reprisal against

those who complained.  Defendant subjected Plaintiff to a work environment pervaded by

racial epithets, inviting of racial derision, and characterized by fear and intimidation.

Defendant condoned widespread disparity and mistreatment of black workers to suppress

their calls for promotion and equality, denying them training, denying them promotions,

denying them opportunity in favor of less qualified Caucasian applicants.  And when such

Bross & Frankel, P.A
Attorneys at Law
102 Browning Lane
Building C-1
Cherry Hill, NJ 08003

systematic and institutional racism failed to quell the protests of its African-American victims, Defendant's condoning approach led to actual threats of violence. As one supervisor told employees, a black employee who complained would be murdered in what he called "friendly fire" if the employee persisted in standing up for his rights.

Then there came the stabbing.

And after the stabbing, the noose.

This racially-charged environment, targeting black employees and keeping them at the lowest levels of the company without opportunity for mobility through threats, intimidation, and humiliation, ***culminated in the hanging of a noose in front of the lockers used by African-American employees***. No greater symbol of Defendant's violations of Plaintiff's civil rights could exist, no greater suggestion of its ultimate end and purpose than this most historically and psychologically-damaging instrument of intimidation and power. In all these ways, Defendant willfully, continually, and systematically discriminated against Plaintiff on the basis of the color of his skin, and allowed this environment to fester and bubble over into acts of violence. To this day, Plaintiff, his daughter, and his friends fear for the safety of their loved one working at Defendant's plant, and suffer through the trauma this treatment has wrought upon their lives.

<u>PARTIES</u>

1.    Plaintiff Barry Murphy is an adult citizen of the United States and a resident of the State of New Jersey, residing at 16 Tempest Lane, Willingboro, NJ 08046.

2.    Defendant Siemens Demag Delaval Turbomachinery, Inc. is a duly organized corporation regularly conducting business in the State of New Jersey, with a place of business at 840 Nottingham Way, Hamilton, NJ 08638.

<u>JURISDICTION AND VENUE</u>

3.      Jurisdiction is invoked pursuant to 28 U.S.C. § 1331 (federal question) and 28

U.S.C. § 1343 (civil rights).

4.      Plaintiff exhausted his administrative remedies with respect to his claims herein,

and attaches as Exhibit "A," Notice of Right to Sue, issued by the U.S. Equal

Employment Opportunity Commission on February 2, 2015.

5.      Venue is founded upon 28 U.S.C. §1391(b) and (c) in that Plaintiff resides within

this judicial district, the events giving rise to this suit substantially occurred within

this judicial district, and. Defendant is a corporate entity, which regularly conducts

business in the District of New Jersey.

<u>FACTS GIVING RISE TO CAUSE OF ACTION</u>

**<u>Background</u>**

6.      Plaintiff incorporates herein the previous averments as if fully set forth in this

paragraph.

7.      Plaintiff Barry Murphy was hired by Defendant in June 1966 as a radial drill press

operator.

8.      Mr. Murphy is African-American.

9.      Mr. Murphy has been a satisfactory employee of Defendant for over four decades

and is extremely experienced in his work.

**<u>The "N-Word"</u>**

10.     The environment at Defendant's Hamilton, New Jersey facility is one in which

multiple Caucasian machinists have long used racial slurs in Defendant's

workplace <u>*with impunity*</u>.

11.    "It was the 'kind of atmosphere where guys feel they can get away with racial remarks," said one Caucasian witness to the New Jersey Division of Civil Rights.

12.    Caucasian employees have confirmed that African-Americans like Plaintiff are repeatedly subjected to verbal abuse in the form of "the n-word" (a racially derogatory word toward African-Americans which is and shall be throughout this document so abbreviated, including when quoted).

13.    ***Paul Schrader, a Caucasian employee of Defendant, confirmed to the New Jersey Division of Civil Rights that Defendant's Supervisor, John Swan, has referred to an African-American employee by the n-word.***

14.    ***Mr. Schrader further confirmed that Supervisor Swan threatened that "I'm gonna get this [n-word] out of here," referring to that same African-American employee.  Supervisor Swan's promise to Schrader to "get that [n-word] out of here" corresponded with his threat to see African-Americans who complain of discrimination murdered in "friendly fire" (see below).***

15.    Use of the n-word by Defendant's supervisors and employees is nothing new; it is, and has been, environmental at Defendant's facility.

16.    Since Plaintiff Barry Murphy was hired in the 1960s, he has been <u>repeatedly subjected to racial slurs and racially-derogatory threats throughout the facility</u>.

17.    Plaintiff reported racial slurs directed at him by his coworkers, yet Defendant took no action on the reports and the racial slurs continued unabated to the present.

18.    For example, in 1995, while Plaintiff was walking through the maintenance building, coworkers yelled at him "hey [n-word]."  When Plaintiff promptly reported this harassment to Senior Foreman Marty McMahon and Union President Frank Sorce, Defendant took no remedial action.

19. Plaintiff has also encountered the n-word written in bathroom stalls at Defendant's facility.

20. *A white co-worker of Plaintiff, Bill Kerr, has further confirmed that Barry Swearer repeatedly and routinely makes racial comments in the workplace like "I wish Hitler had finished the job, I would have no problems."*

21. Swearer has further stated in Mr. Kerr's presence, *"I wish Hitler would have gotten rid of all Jews and black guys."*

22. By February 2012, Swearer was repeatedly making racial comments in the presence of African-American workers like *"all you black guys are good for are making babies and selling drugs."*

23. Swearer's derogatory slurs were specifically reported to Supervisor Gutshall and to Human Resources, to no avail.

24. Mr. Solomon Daniels, an African-American employee of Defendant, reported to his Supervisor (Gutshall) about Swearer's consistent and unending racial slurs since July 2009.  Mr. Daniels has repeatedly reported and complained to management that the slurs are offensive, and asked Gutshall personally to do something about the racist comments.

25. In spite of reports to Defendant of these ongoing racial slurs, both Supervisor John Swan and employee Barry Swearer continued using racial slurs and derision after they were reported.

26. When Mr. Daniels confronted Swearer personally, *Swearer replied "you fucking blacks are wimps," "you're useless," and "you cry too much."*  These statements were witnessed by co-worker Bill Kerr, a Caucasian.

27. Swearer has never been disciplined for these actions.

28.   Supervisor John Swan, who was never disciplined in any way for referring to an African-American employee by the n-word, has also used the term liberally and in front of coworkers in recent years.  He did so even after use of this term against African-Americans was reported to Defendant.

29.   The racial slurs have not stopped, and Defendant has failed to stop them.

30.   In October 2012, the water was turned off in the 34 Building restroom, necessitating Plaintiff's travel to the restroom in D-1 Building.

31.   While on his way out of the bathroom stall, Mr. Murphy overheard employee of Defendant Jeff Pesek and a new engineer speaking.  Mr. Pesek asked the engineer, "Did you get that part off of that [n-word]?"  The engineer to whom Pesek was speaking saw Mr. Murphy and hesitated before answering.

32.   Victor Rivera, an employee of Defendant who is African-American, was working on a part for that engineer at the time.

33.   Because of Defendant's repeated failures to correct the discrimination, and abject tolerance of it, employees like the Caucasian worker who spoke to Division of Civil Rights describe the workplace as "the 'kind of atmosphere where guys feel they can get away with racial remarks."

34.   Caucasian workers have additionally ostracized the African-American employees, and continue to do so to this day without remedy.

35.   On or about March 30, 2011, Mr. Eddie Clarke, an African-American employee of Defendant, was subjected to verbal harassment by Defendant's employee Al Wisner, who screamed at Clarke without warning or provocation, verbally abusing him and proclaiming that he was "sick and tired of you walking around here."

36.   Wisner admitted that other employees had decided to ostracize Mr. Clarke because of his complaints of discrimination.  When Mr. Clarke reported this to Mark Eisenberg in Management, it too was ignored and no action to correct the situation was undertaken by Defendant.

37.   When problems arise, Defendant's answer, if any, has been to simply move employees to different departments and shifts without addressing the environment and underlying issue of discrimination.

38.   Human Resource Director Cheryl Tattler-Pederson, when "investigating" complaints of discrimination, asks very few questions, and witnesses do not feel at liberty to speak freely, reported a Caucasian worker.  "It seemed like they only wanted to hear what they want to hear," said one witness to this hostile environment when speaking with the New Jersey Division of Civil Rights.

39.   On or about March 7, 2012, Tattler-Peterson refused to answer questions from African-American employees about how the company would handle racial harassment.  Just six days later she would also waste the opportunity to hear complaints of discrimination by catching up on her sleep.

40.   Tattler-Peterson used an "investigative meeting" on March 13, 2012 to catch up on her sleep: Mr. Daniels' repeated reports of racial discrimination and retaliation to Defendant was met by nap-time for Tattler-Peterson who, *while Mr. Daniels was detailing unlawful conduct*, actually fell asleep during this so-called "interview."

41.   As a result, African-American employees have little faith that Human Resources will adequately address issues of race discrimination in the workplace because Defendant's systematic pattern has been to ignore the complaints.

**Defendant Repeatedly Receives Complaints of Racial Discrimination and**

**Harassment**

42.    Beginning in February 2008, African American employees of Defendant formally put Defendant on notice of discriminatory practices in which Defendant was engaging.

43.    Mr. Eddie Clarke, an African-American employee of Defendant, filed a human resources complaint concerning disparate pay.

44.    Mr. Clarke and other African-American employees, including Plaintiff, collectively asked for a meeting with the CEO and met with then CEO Charlie Edwards in February 2008 to complain of unfair treatment based on race.

45.    CEO Edwards held a total of three meetings with the African-American employees, including Plaintiff.

46.    During the meetings with CEO Edwards, the African-Americans employees complained of racially-based pay differential, racial harassment, denials of training, and hyper-scrutiny of African-American employees.

47.    Human Resource Director Tattler-Pederson was present for one of these meetings as well.

48.    Despite the complaints, Defendant failed to take prompt and effective remedial measures to end the racially-based pay differential and disparate training and to stop the racial harassment and hyper scrutiny of African-American employees, including Plaintiff.

49.    In April 2009, another grievance was filed, this time against Supervisor John Swan for continued race-based harassment.

50.     In or about June 2009, the new CEO Ken Winn promised to take adequate remedial measures and explicitly promised that no discrimination would take place in the future.

51.     Yet, once again, Defendant failed to take prompt and effective remedial measures to end the racially-based pay differential and disparate training and to stop the racial harassment and hyper scrutiny of African-American employees, including Plaintiff.

52.     On or about August 26, 2009, Mr. Clarke filed formal charges concerning the aforementioned discrimination, retaliation, and hostile work environment with the United States Equal Employment Opportunity Commission.

53.     And yet, the unlawful practices continued unabated, as epithets escalated to threats, and threats escalated to acts of violence.

### Defendant Retaliates Against African-American Complaints: "You'll be Killed in Friendly Fire," Proclaims a Supervisor

54.     Following the complaints of African-Americans to CEOs Edwards and Winn, to Human Resources, and to supervisors, John Swan, a Supervisor, began to retaliate against African-Americans for complaining, culminating in the discovery of a noose hanging in their locker room.

### Death Threats

55.     First, Supervisor Swan announced that *anyone* who went to Human Resources without consulting him first would get caught in "friendly fire" which, he explained, was a military term referring to a soldier being killed by his fellow soldiers.

56.   ***Supervisor Swan demonstrated physically what "friendly fire" would look like,
      and indicated that anyone complaining would be on the receiving end of it if the
      complaints of discrimination continued.***

57.   Supervisor Swan's threat made African-American employees, including Plaintiff,
      afraid for their well-being.  Plaintiff feared, as a result of learning of Supervisor
      Swan's threat, that someone would hurt him physically and may even kill him if
      he spoke out against discrimination.

58.   Enabled and emboldened, a co-worker harassing one African-American employee
      who had complained asked that employee: "you're still alive?"  The harasser's
      question came shortly after Supervisor Swan's threat in front of coworkers to see
      anyone who complained killed in "friendly fire," and was clearly meant to
      reinforce the seriousness of the threat.

Overtime Taken Away

59.   Second, Supervisor Swan told the staff that there would be no further overtime
      because of the discrimination complaints that were made to Human Resources.

60.   On or about July 27, 2009, Supervisor Swan told the workers under his
      supervision that because of the discrimination complaints made to human
      resources "no one will be allowed to work overtime."  Supervisor Swan made it
      clear that the Caucasian workers should blame an African-American for their loss
      of overtime because of the complaints made to human resources concerning
      disparate treatment.

Medical Retaliation

61.   In 2013, Defendant's retaliation against Plaintiff Murphy affected his medical
      care.

62. Since 2008, Plaintiff had been utilizing his corporate health benefits for a work-related injury.

63. At no time during his treatment since 2008 had he ever been required to submit to a drug test as a condition for his treatment for this injury.

64. Plaintiff went to the corporate health center to get treatment for his injury after filing a Charge of Discrimination, and was told for the first time by the head of safety that he needed to submit to a drug test before returning to work that day.

65. Each time Plaintiff told the head of safety that he had no problem taking a drug test, the head of safety kept emphasizing the need for a drug test anyway.

66. Mr. Murphy took and passed the drug test.

67. A week or two later, Plaintiff learned from a Caucasian employee that the Caucasian employee who went to the health center did not have to take the drug test.

68. In fact, the Caucasian employee (Todd Marlin) reported to Plaintiff that he was specifically told before going to the health center that a drug test would not be necessary for him.

<u>Hyper-Scrutiny and Retaliatory Performance Reviews</u>

69. Fourth, Supervisor Swan began harassing Mr. Clarke by scrutinizing his work more closely than Caucasian machinists.

70. Paul Schrader, a Caucasian coworker of Plaintiff, has confirmed that Supervisor Swan purposefully collected metal scrapings to sabotage Mr. Clarke's opportunities for training and advancement.

71. Metal scrapings are one criteria used to determine if an employee is doing sloppy work.  Schrader confirmed that Supervisor Swan did not document mistakes or

collect metal scrapings from White employees, but did so purposefully with respect to Mr. Clarke.

72. Coworker James Lopez, Mr. Clarke's former foreman, has also confirmed that Clarke's work is outstanding but that Defendant was "setting him up to look bad by collecting scraps."

73. Supervisor Swan's evaluations of Mr. Clarke's performance also became considerably less favorable than those he had given Mr. Clarke *before* African-Americans had complained of race discrimination to Human Resources, the CEOs, and the supervisors.

<u>The Assault</u>

74. Fourth, sometime after Supervisor Swan promised "friendly fire" for continued complaints by African-Americans, Mr. Clarke found a metal shank placed in his work area that had been deliberately rigged and positioned to injure him.

75. On or about February 21, 2010, Mr. Clarke was stabbed in his leg by a metal shank that had been, unknown to him, rigged to the area that he, and only he, was working in at the time.

76. The weapon was set up in such a way that, when Mr. Clarke approached, the metal punctured into his leg, slicing open his pants and cutting him.

77. Mr. Clarke's leg was bleeding, and he had to pull the metal from his leg.

78. Mr. Clarke reported it immediately to both his lead-man and to his supervisor, to whom he showed the shank that was rigged to his work-station.

79. But Mr. Clarke's supervisor that day was Supervisor Swan, the same man who had threatened to see killed in "friendly fire" anyone who did not stop complaining of race-discrimination and harassment.

80.   *Referring to the shanking, Supervisor Swan ominously told Mr. Clarke that "someone did it deliberately."*

81.   Supervisor Swan provided no medical assistance, and left Mr. Clarke with this declaration of the intent behind the stabbing.

82.   Mr. Clarke was left to tend to the wound himself, spraying it and bandaging it, and continued working his shift, unsure of who had hurt him, or who yet might.

<u>Defendant Takes No Action Against Supervisor Swan</u>

83.   In response to complaints and evidence of race-based discrimination, Defendant failed to take appropriate and effective remedial action, the most pronounced symbol of which was the failure to discipline Supervisor Swan in any way, and his continued use as a Supervisor.

84.   Defendant claimed to have "investigated" and found "no evidence" of racial harassment on the part of Swan.  But several eye-witnesses undermined and challenged that self-serving conclusion.

85.   Eye-witnesses described to the New Jersey Division of Civil Rights how Supervisor Swan often made derogatory statements about Mr. Clarke, an African-American, and hyper-scrutinized his work in a way he did not with the Caucasian employees in an effort to get him fired after he complained of discrimination.

86.   *Eye-witnesses reported that Supervisor Swan often referred to Mr. Clarke as "n____" [a derogatory word used against African-Americans], and threatened "I'm gonna get rid of that n____" [the same racially-derogatory word].*

87.   Despite this evidence, Defendant failed to remedy the discrimination, retaliation, and harassment to which African-Americans were being subjected in the workplace.

88.   Swan is still a supervisor, and is still employed by Defendant.

### A Noose is Hung

89.   On January 27, 2012, ***an African-American employee found a noose hanging over his head and the heads of the other African-American employees in the locker room in Defendant's workplace.***

90.   The rope noose was dangling above the entranceway between the locker area and a shower stall at a height where the noose would be just below the neck of a standing person.

91.   The noose was attached to the shower curtain rod separating the shower stall from the locker area, and hung near the line of lockers held by African-American workers.

92.   Seeing the noose right next to his locker, the employee became immediately scared and alerted his coworkers about it, including Plaintiff Murphy.

93.   A photograph of the hangman's noose is attached to this Complaint as Exhibit "B." It is a true and accurate representation of what Plaintiff and other African-American employees saw with their own eyes on the morning of January 27, 2012.

94.   Upon seeing the noose, Plaintiff Murphy was scared and wanted to leave work.

95.   Plaintiff felt intimidated and, not knowing who had hung it, was afraid of the people around him. He thought they might try to hurt him, or even kill him or other Black employees.

96.   Plaintiff understood the noose as a clear message to the African-American workers of Defendant to quit complaining about harassment, lack of trainings and promotions.

97.    Plaintiff was unsure of to whom he could talk.  "I wasn't sure who I could talk to because every time I or my coworkers have voiced concern about such things before we have been ignored."  He felt sure "no one would listen, because no one at Siemens ever had."

98.    Plaintiff was also in fear because he remembered the threat Supervisor Swan had made to shoot in "friendly fire" any African-American who continued to protest discrimination and harassment.

99.    Plaintiff does not want to be targeted, hurt or killed, yet nevertheless is forced to work for his livelihood while feeling intimidated, not knowing if at any moment he will be harmed.  "I feel like I have to watch my back because I'm Black.  I definitely don't feel safe there anymore."

100.   His partner witnessed his crying episodes when he would talk with her about how Defendant treats him and his African-American co-workers.  "I really miss the old Barry Murphy.  I would love to have him back," she wrote.

101.   Plaintiff's daughter, too, talks of her dad's eyes welling with tears from feeling unappreciated, meaningless and insignificant, as well as the toll the environment has taken on his emotional and physical well-being.

102.   After the noose was discovered, Caucasian co-worker Bill Kerr reported that he had a conversation with employee of Defendant Jeff Messina, in which Kerr confronted Messina about Messina's history of making racial comments.  Kerr told Messina that the latter would be the first suspect for hanging the noose, to which Messina replied "they will never suspect me."

103.   Messina then told Kerr, "I have an uncle who takes care of all my problems" and "they will use a .22 instead of a .38."

104.   Messina further expressed to Kerr that the African-American employee who discovered the noose is "a lazy [n-word]" and "a leech to the company."

105.   After reporting the noose incident to Defendant, Plaintiff and other African-American employees experienced an increased level of hostility.

106.   African-American employees, including Plaintiff Murphy, have been ostracized; some have also had their vehicles vandalized.

### Defendants Deny Promotions and Trainings to African-Americans

107.   Defendant's discrimination against its African-American employees goes beyond retaliation and tolerating harassment; Defendant's discrimination against its African-American employees is a decades-long history that is still being written in the present.

108.   In Defendant's turbine division, only two African-American supervisors have been employed by Defendant during *the entire time* Plaintiff has been with the company (since 1966) through the filing of Plaintiff's EEOC Charge of Discrimination.

109.   After Plaintiff filed his EEOC Charge, Defendant suddenly hired an African-American Supervisor for the first time in decades, but that Supervisor only lasted a year before leaving citing the segregated "culture" among the races.

110.   The last African-American supervisor before him was boycotted by the Caucasian employees in the 1980s when they refused to work under his direction.  One African-American supervisor in nearly *forty-eight years*, and he was driven out by White protest.

111.   The African-American supervisor, Willie Hood, was the last African-American supervisor employed by Defendant in the entire Hamilton facility as of the time

Plaintiff formally filed his Charge of Discrimination in this matter with the United States Equal Employment Opportunity Commission.

112. In or about 2011 and 2012, two Caucasian males, Mark Morales and Joe Ratkowski, were solicited by Defendant to become Supervisors (Gas Turbine Supervisor and Maintenance Supervisor).  No African-Americans were ever approached about these positions.

113. Defendant usually employed such in-person solicitations for promotions in lieu of an open application process, with the result being Caucasians are promoted while African-Americans are not.

114. In December 2011, Daryl Parkman, an African-American, applied with Defendant as a welder for one of two open positions.

115. When Daryl Parkman applied for a welder position, Defendant told him that the positions had already been filled.  In fact, an approved welding inspector for Defendant observed a less-qualified Caucasian applicant fail the welding test on February 24, 2012, yet Defendant hired this less-qualified, failing Caucasian employee for the job that Mr. Parkman had sought.

116. According to Defendant's procedures, an employee who fails the welding test is prevented from hire.  Yet, the aforementioned welding inspector observed and reported that the Caucasian applicant who failed the welding test was permitted to retest and was hired, as compared to Mr. Parkman, who was told that the position had already been filled.

117. On March 16, 2012, a second Caucasian applicant came in to test for a second opening; again, Daryl Parkman, the African-American applicant, had already been told that the same position had been filled.

<u>Defendant Denies Plaintiff Trainings and Promotions</u>

118.   Plaintiff was once told by a head of personnel for Defendant that higher positions will be "*impossible* for *you.*"

119.   Plaintiff has been repeatedly recommended for promotions by his supervisors, but denied the promotions despite their recommendations, his satisfactory evaluations, and his lack of disciplinary history.

120.   From the time of his hire in 1966 through the present, Plaintiff has also consistently pursued advance training opportunities to increase his ability for higher pay and advancement, but has been repeatedly denied.

121.   Defendant refused to provide Plaintiff timely promotion and training opportunities, such as delaying training in "Stellite Hardfacing" and "Sub-Arc Welding" that was being provided to Caucasians.

122.   In or about 2002, Defendant denied Plaintiff training in Non-Destruct Testing in favor of training employees who were not African-American.

123.   Plaintiff complained of the denial of training to his supervisor, to no avail, and so went to the United States Equal Employment Opportunity Commission and filed a Charge of Discrimination.

124.   Only after Plaintiff went to the EEOC did Defendant relent and provide the training.

125.   In or about 2011 and 2012, four high-tech, computer-controlled machines were installed in the shop where Plaintiff works, including the EDM.  Gaining experience in operating these machines is critical given that they account for an ever-increasing percentage of the work that is produced in the shop.

126.  All of the operators who were selected by Defendant to train on these increasingly important machines were Caucasian except one, and Plaintiff was denied the opportunity to complete his training on the EDM despite his request to complete it.

127.  Esker Tatum, an employee who is also African-American, was also removed from the EDM training and not permitted to complete it.

128.  Denials of timely trainings and promotions are part of a larger pattern of discrimination by Defendant.

129.  In all of these ways, through disparate treatment, through retaliation for reports and complaints, through harassment, and through a pervasively and severely hostile work environment for African-Americans, Defendant has unlawfully discriminated against Plaintiff Barry Murphy and continues to do so as part of an unabated, continuing course of conduct to the present.

COUNT I-<br>TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §2000(e) ET SEQ.<br>(Hostile Work Environment)

130.  Plaintiff incorporates all previous averments as if fully set forth at length herein.

131.  Defendant was at all times relevant, and continues to be, an employer engaged in an industry affecting commerce with more than fifteen employees for each working day in each of twenty or more calendar weeks in the previous three years.

132.  Plaintiff is an employee of Defendant.

133.  Plaintiff is a qualified member of a protected class based on his race; that is, Plaintiff is African-American.

134.  Plaintiff is a satisfactory, qualified employee of Defendant.

135.    Defendant intentionally discriminated against Plaintiff on the basis of his race

        (African-American) by denying him promotions and trainings, by denying him

        equal terms and conditions of employment, and by fostering an environment

        extremely hostile towards African-American employees to the point that

        supervisors and coworkers felt free to subject Plaintiff to racial slurs, epithets,

        degrading and humiliating comments, and even threats of assault, murder, and

        lynching.

181.    Said hostile work environment was not welcomed by Plaintiff.

182.    Said hostile work environment was motivated by the fact that Plaintiff is an

        African-American, and was directed at him on the basis of his race.

183.    Defendant subjected Plaintiff to a hostile work environment that was both

        pervasive and severe, as demonstrated by the duration over which this hostile

        environment was maintained and even promoted, the frequency with which

        racially-hateful acts occurred, the sheer ignorance with which Plaintiff's and

        other African-Americans' complaints were treated, and the severity of the

        hostility including extremely hurtful statements of racial hate, a threat to kill

        complaining black employees, an assault upon a black employee, and the hanging

        of a noose in front of the lockers of African-American employees.

184.    As part of this hostile work environment based on Plaintiff's race, Defendant

        (including Supervisors for Defendant) took multiple adverse employment actions

        against Plaintiff, including, but not limited to: (i) denials of training; (ii) denials

        of promotion; (iii) reductions in responsibilities; (iv) denials of overtime; (v)

        physical and verbal harassment; (vi) ostracism and segregation; (vii) fear for and

        threats to personal safety; (viii) discriminatory performance evaluations; and (ix)

disparate, retaliatory, and unlawful treatment in the terms and conditions of employment.  Each of these adverse employment actions, separately and collectively, altered, harmed and impacted the terms and conditions of Plaintiff's employment.

185.    Similarly situated employees, i.e., Caucasians, were not subjected to the adverse employment actions Defendant took against Plaintiff, nor to the hostile work environment to which Defendant subjected Plaintiff.

186.    Plaintiff further suffered the continual psychological and emotional abuse, and physical safety threat, of being forced to work in this environment under the very persons who were most promoting it.  Plaintiff was forced to work under a Supervisor who threatened that blacks employees who complained of discrimination would be killed in "friendly fire," with coworkers and supervisors who regularly used racial slurs, with persons who operated unimpeded, in a shroud of enforced secrecy, under a condoning management, to physically injure a black employee with a fashioned shank and to hang a noose above the heads of African-American employees.

187.    All of these circumstances, in total, combined to create an environment extremely hostile and abusive to African-American employees including Plaintiff, and to any who complained of discrimination and retaliation against black workers. That environment fundamentally, in a very tangible way, altered the conditions of Plaintiff's employment by rendering the most important condition of their safety and well-being at Siemens that they shut up and take it, a fact that was repeatedly communicated to them by the actions *and* inactions of supervisors and management.

188.   Any reasonable person in Plaintiff's positions would have felt the same way: this environment was in every way hostile toward African-Americans.

189.   Plaintiff in fact perceived this work environment as hostile toward them on the basis of their race, and suffered harm accordingly.

190.   Defendant knew or should have known of the creation and maintenance of this racially-hostile work environment.

191.   Defendant had managerial, supervisory, or other control over persons participating in the creation and maintenance of this racially-hostile work environment, including Supervisors.

192.   Defendant was negligent and reckless in allowing this environment to continue, and failed to take prompt and appropriate remedial action to abate it.  Indeed, several members of upper-management participated in or were willfully indifferent to the creation and maintenance of the racially-hostile work environment.

193.   Defendant acted maliciously with respect to the aforementioned conduct, and Defendant was willful and wanton with respect to same.

194.   Said hostile work environment directed at Plaintiff on the basis of his race violates Plaintiff's civil rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq.

195.   WHEREFORE, Plaintiff pray for the following relief: Plaintiff demands compensatory damages for both his economic and non-economic damages including for emotional distress and mental anguish, punitive damages in an amount to be determined, an award of attorney fees and costs as provided in 42

U.S.C. §1988, and any other equitable, declaratory, or injunctive remedies that

the Court deems reasonable and just.

COUNT II-
TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §2000(e) ET SEQ.
(Disparate Treatment)

196.    Plaintiff incorporates all previous averments as if fully set forth at length herein.

197.    Defendant was at all times relevant, and continues to be, an employer engaged in

an industry affecting commerce with more than fifteen employees for each

working day in each of twenty or more calendar weeks in the previous three

years.

198.    Plaintiff is an employee of Defendant.

199.    Plaintiff is a qualified member of a protected class based on his race; that is,

Plaintiff is African-American.

200.    Plaintiff is a satisfactory, qualified employee of Defendant.

201.    Defendant intentionally discriminated against Plaintiff on the basis of his race

(African American) by subjecting him to multiple adverse employment actions

including, but not limited to: (i) denials of training; (ii) denials of promotion; (iii)

reduction in responsibilities; (iv) denials of overtime; (v) physical and verbal

harassment; (vi) ostracism and segregation; (vii) fear for and threats to personal

safety; (viii) discriminatory performance evaluations; (ix) a hostile work

environment; and (x) disparate, retaliatory, and unlawful treatment in the terms

and conditions of employment.  Each of these adverse employment actions,

separately and collectively, altered, harmed and impacted the terms and

conditions of Plaintiff's employment.

202.   Plaintiff's race (African-American) was a determinative factor in Defendant's adverse employment decisions with respect to Plaintiff.

203.   The aforementioned adverse employment actions were perpetrated by and/or condoned and sanctioned by Supervisors and management-level employees who had the power and authority to, and in fact did, adversely affect the terms and conditions of Plaintiff's employment.

204.   Similarly situated employees, i.e., Caucasians, were not subjected to the adverse employment actions Defendant took against Plaintiff.

205.   Defendant acted maliciously with respect to the aforementioned conduct, and Defendant was willful and wanton with respect to same.

206.   Said disparate treatment violates Plaintiff's civil rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq..

207.   WHEREFORE, Plaintiff prays for the following relief: Plaintiff demands compensatory damages for both his economic and non-economic damages including for emotional distress and mental anguish, punitive damages in an amount to be determined, an award of attorney fees and costs as provided in 42 U.S.C. §1988, and any other equitable, declaratory, or injunctive remedies that the Court deems reasonable and just.

<u>COUNT III-</u>
<u>TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §2000(e) ET SEQ.</u>
<u>(Retaliation)</u>

208.   Plaintiff incorporates as if fully set forth at length herein all previous averments.

209.   Defendant was at all times relevant, and continues to be, an employer engaged in an industry affecting commerce with more than fifteen employees for each

working day in each of twenty or more calendar weeks in the previous three

years.

210.   Plaintiff is an employee of Defendant.

211.   Plaintiff is a qualified member of a protected class based on their race; that is,

Plaintiff is African-American.

212.   Plaintiff is a satisfactory, qualified employee of Defendant.

213.   Plaintiff engaged in protected activity by reporting race-based discrimination,

retaliation, harassment, and a hostile work environment directed at African-

Americans in their workplace.  In other words, Plaintiff opposed unlawful

discrimination.

214.   Plaintiff's protected activity was based on a good faith belief that race-

discrimination, retaliation, harassment, and a hostile work environment were

occurring in their workplace such that the civil rights of African-American

employees were being violated.

215.   As a result of Plaintiff's engagement in the protected activity of reporting race-

based discrimination, retaliation, harassment, and a severely hostile work

environment, Defendant retaliated against Plaintiff by subjecting him to multiple

adverse employment actions including, but not limited to: (i) denials of training;

(ii) denials of promotion; (iii) reduction in responsibilities; (iv) denials of

overtime; (v) physical and verbal harassment; (vi) ostracism and segregation;

(vii) fear for and threats to personal safety; (viii) discriminatory performance

evaluations; (ix) a hostile work environment; and (x) disparate, retaliatory, and

unlawful treatment in the terms and conditions of employment.   Each of these

acts of retaliation, separately and collectively, altered, harmed and impacted the terms and conditions of Plaintiff's employment.

216.   Plaintiff's engagement in the protected activity was a determinative factor in Defendant subjecting him to adverse employment actions.

217.   The aforementioned adverse employment actions were perpetrated by and/or condoned and sanctioned by Supervisors and management-level employees who had the power and authority to, and in fact did, adversely affect the terms and conditions of Plaintiff's employment.

218.   Defendant's conduct would discourage a reasonable worker in Plaintiff's position from engaging in similar protected activities of reporting race-discrimination, retaliation, harassment, and a hostile work environment.

219.   Defendant acted maliciously with respect to the aforementioned conduct, and Defendant was willful and wanton with respect to same.

220.   Said retaliation violates Plaintiff's civil rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000(e) et seq.

221.   WHEREFORE, Plaintiff prays for the following relief: Plaintiff demands compensatory damages for both his economic and non-economic damages including for emotional distress and mental anguish, punitive damages in an amount to be determined, an award of attorney fees and costs as provided in 42 U.S.C. §1988, and any other equitable, declaratory, or injunctive remedies that the Court deems reasonable and just.

## PRAYER FOR RELIEF

222.   WHEREFORE, Plaintiff requests all relief available under the law, including but not limited to:

a.      Back pay with interest from the date of Defendant's unlawful and
        retaliatory actions;

b.      A decree awarding Plaintiff front pay with interest;

c.      Attorney fees, litigation expenses and all allowable costs with interest;

d.      Unlimited compensatory damages for Plaintiff's non-economic injuries,
        including loss of personal and professional reputation and mental suffering
        and emotional anguish;

e.      Punitive damages for Defendant's discriminatory practices which were
        committed with malicious and reckless indifference to Plaintiff's
        federally-protected rights;

f.      A decree finding Plaintiff's civil rights were intentionally violated by
        Defendant and awarding Plaintiff further appropriate equitable, declaratory
        and injunctive relief;

g.      Expert witness fees with interest;

h.      A trial by jury is demanded.

                                        By:

                                        /s/ Richard L. Frankel
                                        Richard L. Frankel, Esq.
                                        Bross & Frankel, P.A.
                                        102 Browning Lane, Bldg. C-1
                                        Cherry Hill, NJ 08003
                                        (856) 795-8880/1242(fax)
                                        rich@ltdbenefitslaw.com

                                        Kelly A. Ohlert, Esq.
                                        The Law Offices of Kelly A. Ohlert, Esq., LLC
                                        17 E. Germantown Pike, 2nd Floor
                                        Plymouth Meeting, PA 19462
                                        kelly@ohlertlaw.com
                                        (admission pro hac vice pending)

Dated: April 24, 2015                   ATTORNEYS FOR PLAINTIFF

## <u>CERTIFICATION OF RELATED CASES</u>

The matter in controversy is related to another action pending in this Court,

namely, <u>Clarke v. Siemens Demag Delaval Turbomachinery, Inc., et al.</u>, 3:15-cv-02234-

MAS-DEA, filed on March 30, 2015.  The Plaintiff here, Barry Murphy, is not a party to

that action, nor party to any other action pending in this or any other court.  While

Plaintiff Murphy here brings his own claims against the same Defendant employer, his

claims and many of the facts underlying them are either the same or substantially similar

to those made by Mr. Clarke in the related matter.


By:

<u>/s/ Richard L. Frankel</u>
Richard L. Frankel, Esq.
Bross & Frankel, P.A.
102 Browning Lane, Bldg. C-1
Cherry Hill, NJ 08003
(856) 795-8880/1242(fax)
rich@ltdbenefitslaw.com

Kelly A. Ohlert, Esq.
The Law Offices of Kelly A. Ohlert, Esq., LLC
17 E. Germantown Pike, 2nd Floor
Plymouth Meeting, PA 19462
kelly@ohlertlaw.com
(admission pro hac vice pending)

Dated: April 24, 2015                    ATTORNEYS FOR PLAINTIFF